UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

KAI ENTERPRISES, L.L.C.                    CIVIL ACTION

VERSUS                                     NO: 09-118

BOH BROS. CONSTRUCTION CO., L.L.C.         SECTION R

## ORDER AND REASONS

Plaintiff KAI Enterprises moves for summary judgment in this suit involving an alleged breach of a maritime contract (R. Doc. 40). Defendant Boh Bros. files a cross-motion for summary judgment (R. Doc. 75). The motions are both DENIED to the extent discussed in this Order.

## I. Background

On June 1, 2007, KAI and defendant Boh Bros. entered into a bareboat charter under which Boh Bros. was to use the quarters barge ESCAPE to house workers during a maritime project.[1] The contract specified that Boh Bros. was to pay KAI $1,200 for every day of use, with a minimum of fifteen days.[2] According to KAI, the contract also specifies that if there is any damage to the vessel, Boh Bros. shall, at KAI's option, either repair the

_____

[1] According to KAI, a "quarters barge" is "a floating deck barge converted for light duty as a floating hotel for maritime workers." R. Doc. 40 at 2.

[2] R. Doc. 40, Ex. A-1 at 2.

vessel or pay a repair estimate.  Finally, the charter states
that Boh Bros., by its acceptance of the vessel, stipulates that
the barge is seaworthy and in good condition, and that KAI makes
no representation or warranty about the condition of the vessel
or its fitness for Boh Bros.'s purposes.

According to KAI, Boh Bros. returned the ESCAPE on June 30,
2007, with a hole in its hull.  The ESCAPE was allegedly towed
from Boh Bros.'s work site by two vessels: the M/V CAJUN III,
which is owned and operated by Stagg Marine, Inc., and the M/V
ZIP II, which is owned and operated by Transinland Marine, Inc.
After the ESCAPE was returned to the dock and all Boh Bros.
personnel had departed, KAI alleges that its employees noticed
that the vessel was listing.

After making this observation, the employees discovered a
hole in the hull of the vessel and noticed that compartments of
the barge contained water.[3]  They began to pump water out of the
barge between June 30 and July 2, and on July 2, KAI employees
contacted J&J Diving Company to apply a salvage patch to the
barge's hull.  After J&J applied the patch, KAI pumped out the
remaining water.[4]  The barge remained dry and the employees
returned home on July 3.  KAI employees returned on July 5, 2007,

---

[3] *See* R. Doc. 75, Ex. B at 162 (deposition of Thomas
Jeanne).

[4] *Id.* at 183-87.

2

at which point KAI discovered that the ESCAPE had sunk in the marina.[5] The vessel was rendered a total loss.

On July 6, after the loss of the ESCAPE, KAI sent Boh Bros. a letter explaining the damage and stating that the boat would remain on charter until repairs or an inquiry into the damage could be made.[6] The parties do not appear to dispute that this was the first time KAI contacted Boh Bros. about the condition of the barge. Boh Bros., in response, denied all liability.[7] Apparently after an investigation, KAI informed Boh Bros. that it had determined that the damage was caused by Boh Bros.'s activities and that the charter had not yet terminated.[8] It later made demand on Boh Bros. to pay $250,000, the value of the ESCAPE, in addition to the accrued charter hire of "no less than $470,000."[9] According to KAI, Boh Bros. did not respond to these demands. KAI also asserts that, because the barge was a total loss, it could not charter it to another party to mitigate

---

[5] *See* R. Doc. 40, Ex. B at 8 (admission of Boh Bros.). The parties dispute whether KAI sent someone to check on the barge on July 4. The Court need not resolve this dispute at this time.

[6] *Id.*, Ex. D-1 (July 6, 2007, letter from Thomas Jeanne to Richard Berry).

[7] *Id.*, Ex. D-2 (Aug. 6, 2007, letter from Warren Perkins to Thomas Jeanne).

[8] *Id.*, Ex. D-3 (Feb. 21, 2008, letter from Thomas Jeanne to Richard Berry).

[9] *Id.*, Ex. D-4 (July 9, 2008, letter from Harold Flanagan to Warren Perkins).

damages, nor did it have the funds to acquire a new barge.  This
condition lasted until November of 2008, when KAI's hull insurer
— Continental Insurance Company — paid KAI the full value of the
ESCAPE.[10]

KAI filed this suit for breach of contract in January of
2009.  It contends that the charter did not terminate when Boh
Bros. returned the ESCAPE because the barge was returned damaged,
and Boh Bros. neither made neither repairs nor payment.  It seeks
more than $500,000 of unpaid charter hire that accrued from the
date Boh Bros. returned the vessel in June of 2007 until the time
that Continental paid KAI the value of the ESCAPE in November of
2008.  It also seeks attorneys' fees and other costs.  KAI
amended its complaint to add Stagg and Transinland as defendants,
alleging that they are responsible *in solido* for their neglect,
fault, want of due care, and breach of warranty for their towing
of the ESCAPE.

Continental filed a separate suit against Boh Bros., Stagg,
and Transinland in February of 2009,[11] alleging that the
agreement it had with KAI contains a subrogation provision that
allows Continental to bring suit based on defendants' negligence
and breach of the charter party.  It seeks $250,000 for the full

---

[10] *Id.*, Ex. D-5.

[11] Stagg and Transinland were added in an amended complaint.
R. Doc. 20.

cost of the ESCAPE as well as an additional $100,000 for the salvage expense of the ESCAPE, which Continental also paid.

Boh Bros. filed a third-party complaint against J&J Diving and its comprehensive liability insurer, claiming that the sinking of the ESCAPE was J&J Diving's fault and not Boh Bros.'s. Specifically, Boh Bros. alleges that J&J Diving failed to determine the condition of the ESCAPE's hull properly, failed to repair and patch the hole in the vessel, failed to monitor the ingress of water into the ESCAPE's hull, and failed to pump the water that did enter the vessel.

KAI now moves for summary judgment on its claim. Boh Bros. opposes summary judgment on several grounds. First, it seeks to present evidence that the hull was in poor condition when it took possession of the ESCAPE. Next it argues that issues of fact exist as to the ownership of the ESCAPE, and thus KAI's ability to lease it. It contends that, to the extent that the ESCAPE was returned damaged, there are issues of fact that surround the cause of the damage, specifically whether the damage was the result of ordinary wear and tear. Finally, it argues that, under the doctrines of frustration and impossibility, the charter terminated when the ESCAPE sank. In addition, Boh Bros. files a separate cross-motion for summary judgment, alleging that the charter terminated at some point between the return of the ESCAPE and its sinking several days later.

5

## II. Legal Standard

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[12] When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[13] All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[14]

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'"[15] The

---

[12] FED. R. CIV. P. 56(c)(2); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[13] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008).

[14] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

[15] *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir. 1991).

nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party."[16]

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim.[17]  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists.[18]  The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial.[19]

---

[16] *Id.* at 1265.

[17] *See Celotex*, 477 U.S. at 325.

[18] *See id.* at 324.

[19] *See, e.g., id.* at 325; *Little*, 37 F.3d at 1075; *Isquith ex rel. Isquith v. Middle South Utils., Inc.*, 847 F.2d 186, 198 (5th Cir. 1988), *cert. denied*, 488 U.S. 926 (1988).

## III. Analysis

*A. Contractual Terms and Effect of Stipulation*

The charter between the parties is a maritime contract, which is interpreted in accordance with general common-law principles of contract law.[20] A court will first look to the intent of the parties as expressed by the terms of the agreement.[21] The contractual language should be given its plain meaning unless the terms are ambiguous.[22] A court should read the contract as a whole, and if the language is not ambiguous, the court "should not look beyond the written language of the contract to determine the intent of the parties."[23] If the language is ambiguous, a court may consider extrinsic evidence to determine the parties' intent at the time of agreement.[24] When maritime law is silent about a question, the Court looks to general common law or, in some circumstances, state law.[25] "To

---

[20] *See Hadjipateras v. Pacifica, S.A.*, 290 F.2d 697, 703 (5th Cir. 1961); *see also In re Tasch, Inc.*, 46 Fed. App'x 731, 2002 WL 1973464, at *2 (5th Cir. July 31, 2002).

[21] *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 (5th Cir. 1986).

[22] *Weathersby v. Conoco Oil Co.*, 752 F.2d 953, 955 (5th Cir. 1984).

[23] *Fontenot*, 791 F.2d at 1214.

[24] *Atlantic Lines, Ltd. v. Narwhal, Ltd.*, 514 F.2d 726, 730 (5th Cir. 1975).

[25] *See Coastal Iron Works, Inc. v. Petty Ray Geophysical*, 783 F.2d 577, 582 (5th Cir. 1986) ("Although state law may

the extent that it is not inconsistent with admiralty

principles . . . state contract law may be applied to maritime

contracts."[26]

Here, the bareboat charter between the parties specifies

that "[a]cceptance or use of the vessel by the charterer will be

deemed to be an acknowledgment that the vessel is seaworthy, in

---

supplement maritime law where maritime law is silent, or where a
local matter is at issue, state law may not be applied where it
would conflict with maritime law.") (citations omitted); *Marastro
Compania Naviera v. Canadian Maritime Carriers, Ltd.*, 959 F.2d
49, 53 (5th Cir. 1992) (applying general common law, not state
law, to issue of trespass because of the maritime law's
principles of "uniformity and simplicity"); *Wilburn Boat Co. v.
Fireman's Fund Ins. Co.*, 348 U.S. 310, 313-14 (1955) ("In the
field of maritime contracts, as in that of maritime torts, the
National Government has left much regulatory power in the
States."); *see also Ingersoll-Rand Fin. Corp. v. Employers Ins.
of Wausau*, 771 F.2d 910, 912 (5th Cir. 1985) ("the interpretation
of a contract of marine insurance is — in the absence of a
specific and controlling federal rule — to be determined by
reference to appropriate state law"); *In re Torch, Inc.*, No. 94-
2300, 2000 WL 798457, at *6 (E.D. La. June 21, 2000) ("where
federal maritime law is silent, the Court will look to Louisiana
law"); *Hebert v. Outboard Marine Corp.*, 638 F. Supp. 1166, 1170
(E.D. La. 1986) ("When there is no uniform federal rule, courts
applying maritime law may adopt state law by express or implied
reference or 'by virtue of the interstitial nature of federal
law.'"); 1 Thomas J. Schoenbaum and Jessica L. McClellan, Admiralty and
Maritime Law § 4-2 (4th ed. 2003 & Supp. 2010) ("the general
maritime law is not a complete legal system; there are numerous
gaps that must be filled either by the federal judiciary, in
making up new rules of law, or by the application of state law").

[26] *Ham Marine, Inc. v. Dressler Indus., Inc.*, 72 F.3d 454,
459 (5th Cir. 1995). The charter at issue was entered into by
Louisiana parties and performed in Louisiana. To the extent that
one state's laws apply, therefore, they would be the laws of
Louisiana.

good condition, and fit for the charterer's purpose."[27]  It also

states that KAI "does not make any representation, warranty, or

covenant, express or implied, with respect to the condition,

quality, durability, or suitability for charterer's intended use

of the vessel."[28]  The section discussing liability for damage to

the vessel reads as follows:

> LIABILITY FOR LOSS OR DAMAGE
>
> Charterer assumes all risk of loss of and damage to the
> vessel from any cause.  In the event of loss of or
> damage to the vessel, charterer, at the option of
> owner, shall:
>
> a. Place the vessel in good repair; or
> b. Surrender the vessel to owner and pay the lowest of
>    three shipyard repair estimates obtained by owner,
>    whereupon this agreement shall terminate.
> c. If the vessel is lost, pay owner in cash the value
>    of the vessel as set forth in [the contract],
>    whereupon this agreement shall terminate.
>
> Obligations of charterer established in this section
> shall be abated to the extent of insurance payments
> received by owner.[29]

The value of the ESCAPE, as set forth in the contract, is

$250,000.[30]

The Court notes several features of this contractual

language.  First, it is true that charters contain an implied

---

[27] R. Doc. 40, Ex. A-1 at 1.

[28] *Id.*, Ex. A-1 at 5.

[29] *Id.*, Ex. A-1 at 2.

[30] *Id.*, Ex. A-1 at 1.

warranty of seaworthiness, even when one is not expressly stated.[31]  This implied warranty, however, is subject to waiver by express language.[32]  Here, Boh Bros. expressly waived any warranty of seaworthiness in clear and unequivocal language by agreeing that KAI "has not made and does not make any representation, warranty, or covenant, express or implied, with respect to the condition, quality, durability, or suitability for charterer's intended use of the vessel."[33]

Second, Boh Bros. agreed in the contract that by accepting the ESCAPE, it acknowledged that "the vessel [was] seaworthy, in good condition, and fit for [Boh Bros.'s] purpose."  Because this stipulation is a part of the contract, the Court will interpret its plain language and will not examine extrinsic evidence to the contrary absent ambiguity.[34]  Boh Bros., in an attempt to introduce evidence that the ESCAPE was *not* in good condition, correctly asserts that the interpretation of contracts often depends on factual disputes.  But the Court will resolve factual disputes based on extrinsic evidence only when the contract is

---

[31] *See, e.g., Cullen Fuel Co. v. Hedger*, 290 U.S. 82, 88 (1933); *Texaco, Inc. v. Universal Marine, Inc.*, 400 F. Supp. 311, 319 (E.D. La. 1975).

[32] *See Cullen Fuel*, 290 U.S. at 88 (implied warranty of seaworthiness may be "negatived only by express covenant").

[33] R. Doc. 40, Ex. A-1 at 5.

[34] *Fontenot*, 791 F.2d at 1214.

ambiguous.[35]  Under federal maritime law, "a court may not look

beyond the written language of the document to determine the

intent of the parties unless the disputed contract provision is

ambiguous."[36]  The language of this clause is not ambiguous; it

establishes that the parties intended to be bound by the

stipulation.[37]  Here, the signed, unambiguous contract is clear

that the parties intended to be bound by the stipulation that the

ESCAPE was in good condition.  The Court will therefore not

consider the evidence Boh Bros. has submitted regarding the

condition of the ESCAPE at the time of the charter.[38]

Boh Bros. further attempts to escape the effect of this

provision by claiming that KAI intentionally or negligently

---

[35] Boh Bros. relies upon a 2006 case from this district,
*McDonough Marine Services v. Core Industries, Inc.*, No. 04-2145,
2006 WL 2547980 (E.D. La. Aug. 31, 2006), for the proposition
that it should be allowed to introduce evidence that the ESCAPE
was in poor condition when it took possession of the barge.  That
case is distinguishable from the facts here.  The charter in that
case was unsigned, and the issue of whether the court should have
considered extrinsic evidence does not appear to have been
raised.  The Court finds that it does not control the outcome
here.

[36] *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 332-33
(5th Cir. Unit A Aug. 1981).

[37] *Cf. McAllister Lighterage Line, Inc. v. Ins. Co. of N.
Am.*, 244 F.2d 867, 871 (2d Cir. 1957) (noting similar language in
case where vessel sank while on charter and also holding that,
because this language clearly waived warranty of seaworthiness,
the district court properly struck defendant's defense of
unseaworthiness even though "[t]he conceded facts show[ed] that
the vessel was unseaworthy").

[38] *See Corbitt*, 654 F.2d at 332-33.

misrepresented the state of the hull by providing Boh Bros. with a survey that did not include the state of the hull and by failing to disclose that the vessel had previously been denied insurance based on the condition of the hull.[39]  But Boh Bros. has identified no actual misrepresentation that KAI made.  It freely admits that the survey it was shown "did not address the ESCAPE's hull beneath the water or below deck or inspect the interior of the base."[40]  The survey itself makes clear that the vessel was inspected while afloat "and therefore without sighting bottom, testing for tightness, . . . conducting sea trials or opening up any of those places ordinarily concealed. . . . No determination of structural integrity or inherent stability has been made and no opinion is expressed in that regard."[41]  A survey that plainly discloses that it does not include an assessment of the hull cannot amount to a misrepresentation regarding the state of the hull.[42]

But even assuming that this rises to the level of a misrepresentation, the explicit and unambiguous language of the

---

[39] R. Doc. 62 at 17.

[40] *Id.* at 3.

[41] *Id.*, Ex. 4 at 3.

[42] Boh Bros. additionally argues that KAI made misrepresentations to its insurer.  But it has not explained how this is relevant to whether Boh Bros. is responsible for the payment of additional charter hire under the charter.

charter itself states that KAI "has not made and does not make any representation, warranty, or covenant, express or implied, with respect to the condition, quality, durability, or suitability for charterer's intended use of the vessel."[43]  Boh Bros. cannot assert that KAI made a misrepresentation when the contract in question makes clear that KAI made no representation to begin with.  Even if KAI did rely on a misrepresentation, "many courts have found a plaintiff's reliance [on extra-contractual representations] to be unreasonable as a matter of law when the parties have a valid contract defining their rights and limiting the ways in which the contract may be modified."[44]  Although the charter here does not contain an integration clause, it is hardly reasonable for a party to rely on any extra-contractual representation that *directly* conflicts with the provisions of a written, signed contract that expressly deny any representation as to the condition of the vessel.  In addition, Boh Bros.'s Rule 30(b)(6) deponent explicitly stated that the charter made no misrepresentations.[45]  Boh Bros.'s argument is thus unavailing.

---

[43] R. Doc. 40, Ex. A-1 at 5.

[44] *See Drs. Bethea, Moustoukas & Weaver LLC v. St. Paul Guardian Ins. Co.*, 376 F.3d 399, 404 (5th Cir. 2004).

[45] R. Doc. 93, Ex. A at 48-49; *see also Imperial Trading Co. v. Travelers Prop. Cas. Co. of Am.*, No. 06-4262, 2009 WL 2242380, at *9 (E.D. La. July 24, 2009) (discussing effect of Rule 30(b)(6) deponent testimony).

14

Finally, Boh Bros. asserts that KAI failed to disclose that insurance on the ESCAPE had been denied at an earlier time because of the condition of its hull.  This, however, is not a misrepresentation.  Boh Bros. has not provided the Court with any authority that KAI had a duty to disclose the history of attempts to insure the ESCAPE.  Boh Bros.'s misrepresentation arguments therefore fail.

*B. Ownership of the ESCAPE*

Boh Bros. contends that summary judgment is inappropriate because there is an issue of fact as to whether the charter was valid from its inception.  It notes that Thomas Jeanne, Jr., personally bought the ESCAPE in 2006.  Thomas Jeanne is the president of KAI.  Boh Bros. argues that there is no documentation to verify that ownership of the ESCAPE was properly transferred from Jeanne to KAI, and KAI thus had no right to bind the vessel.  Boh Bros. makes no allegation that Jeanne, the owner of the ESCAPE, would have objected to the lease or would have prevented KAI from entering into it; it merely suggests that, because KAI has not presented documentation of the transfer, the charter may have been rendered entirely invalid.

This argument fails.  The Court need not address the issue of whether KAI properly held title to the ESCAPE because proper title is not determinative of a lease's validity.  Under

Louisiana law, for example, "[a] lease of a thing that does not belong to the lessor may nevertheless be binding on the parties."[46] Boh Bros. has pointed to nothing in maritime law that would support the opposite conclusion, and the Court is aware of none. Furthermore, a contrary rule would allow a party — specifically anyone who voluntarily entered into a lease and later became dissatisfied with its terms — to attack the contract on the grounds that the lessor is not able to provide clear documentation of ownership.

*C. Causation*

The parties appear to disagree as to the cause of the damage to the ESCAPE. KAI contends that the ESCAPE's hull was punctured by debris when it struck a debris-strewn mudflat and that the Court should consider the vessel to have sunk as a result of this

---

[46] LA. CIV. CODE. art. 2674; *Sauve Heirs, Inc. v. Nat'l Bus. Consultants, Inc.*, 522 So. 2d 686, 689 (La. Ct. App. 1988) (rejecting similar argument); *see also, e.g., Air-Ag, Inc. v. F&H Santa Fe Rail, Inc.*, 22 S.W.3d 596, 598 (Tex. App. 2000) ("The general, well-established rule is that a tenant cannot dispute its landlord's title while still in possession under that landlord. In other words, a tenant is estopped to deny its landlord's title or to claim adversely to the landlord, and it is immaterial whether the landlord had title at the time the lease was entered. The tenant, having reaped all the benefits from the lease agreement, may not dispute the authority of the person from whom those benefits are derived."); *Grant v. Briskin*, 603 A.2d 324, 329 (R.I. 1992) (same); *Tilyou v. Reynolds*, 15 N.E. 534, 534 n.1 & 535 (N.Y. 1888) (collecting common-law authorities for same proposition).

collision.[47]  Boh Bros. suggests that the damage may have been
the result of ordinary wear and tear for which it is not
responsible under the charter.  It also suggests that the damage
was not caused while the ESCAPE was on charter.

Typically, under a bareboat charter, the owner must prove
that damage caused during the course of the charter was the
result of the charterer's negligence.  If the owner demonstrates
that the vessel was given to the charterer in good condition and
returned damaged, he has made out a prima facie case of the
charterer's negligence and the burden shifts to the charterer to
prove that the damage did not result from its negligence.[48]  But
here, the parties have contracted around this rule.[49]  The
charter provides that Boh Bros. "assumes all risk of loss of and
damage to the vessel *from any cause.*"[50]  Accordingly, Boh Bros.
has accepted the risk of all damage or loss during the charter,

---

[47] KAI elsewhere suggests that the ESCAPE slammed into the
concrete dock while it was being moored.  *See* R. Doc. 94, Ex. F
at 2.

[48] *See Marine Equipment, Inc. v. Martin*, 184 F. Supp. 111,
113 (E.D. La. 1960) (Wright, J.); *see also Stoufflet v. Cenac
Towing Co.*, 236 F. Supp. 198, 201 (E.D. La. 1964); *Compass Marine
Corp. v. Calore Rigging Co.*, 716 F. Supp. 176, 180-81 (E.D. Pa.
1989).

[49] *See Dow Chem. Co. v. Texaco Refining & Mktg.*, 887 F.
Supp. 853, 864 (E.D. Va. 1995) ("The parties to a bareboat
charter may modify their traditional maritime rights and
liabilities as bailor and bailee by including specific provisions
in the charter party.").

[50] R. Doc. 40, Ex. A-1 at 2.

even damage or loss that was not caused by Boh Bros.'s own negligence.

Further, the evidence demonstrates that the damage to the vessel was not the result of wear and tear. The charter between the parties demands that the ESCAPE be returned in good repair, "ordinary wear and tear resulting from proper use alone accepted [sic]."[51] The charter does not define the term "ordinary wear and tear," but other courts have defined it as "that deterioration of condition or depreciation in value attributable to normal and reasonable use of an object."[52] Boh Bros. does not provide any evidence that the damage resulted from ordinary wear and tear; it merely suggests that the ESCAPE's damage may have been the result of it.[53] There is a clear difference between wear and tear and damage, and structural damage is not considered

_____

[51] R. Doc. 40, Ex. A-1 at 3.

[52] *Otto Candies, Inc. v. McDermott Int'l, Inc.*, 600 F. Supp. 1334, 1343 (E.D. La. 1985); *see also Darien Bank v. Travelers Indem. Co.*, 654 F.2d 1015, 1020 (5th Cir. 1981) ("loss or damage resulting from the ordinary and inevitable action of the winds and waves, such as natural decay and wear and tear, is excluded") (quoting *U.S. Nat. Bank of Galveston v. Md. Nat.l Ins. Co.*, 218 F. Supp. 259, 249 (S.D. Tex. 1963)); BLACK'S LAW DICTIONARY 1731 (9th ed. 2009) ("Deterioration caused by ordinary use; the depreciation of property resulting from its reasonable use").

[53] In so doing, Boh Bros. argues that, because the hull of the ESCAPE was in bad condition at the outset, ordinary wear and tear *may* have caused the damage. As mentioned, Boh Bros. stipulated in the charter that the ESCAPE was in good condition when it was accepted, and the Court will not examine evidence to the contrary.

18

wear and tear.[54]  The damage here, which was sufficient to sink
the ESCAPE, is structural damage.  No evidence demonstrates that
it is wear and tear.

Beyond this, the parties dispute when the damage took place.
KAI's position relies on the general rule that when a vessel is
damaged in a collision and sinks shortly thereafter, a court will
presume that the sinking was the result of the collision.[55]
There is some time limitation on this principle,[56] but its
applicability need not be decided now, because there is an issue
of fact as to whether there was a collision at all.  Again, KAI
contends that the ESCAPE struck its hull upon a mudflat that had
been strewn with debris while being towed to the marina where it
would be returned to KAI.  KAI submits testimony from Kevin Kuhn,
a KAI employee upon the ESCAPE, indicating that the barge was
being towed back to the marina "at a very fast rate."  Kuhn
complained about the speed and the tugboats slowed down.  But
"the tugboats sped up again and were rapidly bringing the Escape
within several feet of a shoreline or mudflat that had a lot of
debris.  Suddenly, I felt the Escape forcefully strike the water

_____

[54] *See Otto Candies*, 600 F. Supp. at 1343-44.

[55] *See Dreijer v. Girod Motor Co.*, 294 F.2d 549, 554 (5th
Cir. 1961).

[56] *See id.* ("The causal relation between the wrongdoing on
September 9 and the sinking on October 17 is not clear enough to
bring this case within the [rule]").

bottom. A crewman of one tugboat complained that his boat was also getting stuck."[57]  Kuhn further averred that, after the ESCAPE arrived at the marina, he noticed that it was leaning to one side and that there was a puncture hole below the starboard fuel tank.[58]

Boh Bros., however, presents the testimony of Martin Helton, who was the captain of one of two tugs that were towing the ESCAPE. Helton testified generally that he did not come too close to the river banks during the time he was towing the ESCAPE.[59]  Furthermore, Helton stated that his boat never ran aground while it was towing the ESCAPE. He testified that because his boat did not run aground, the ESCAPE did not run aground, either:

> Because my boat don't rub [the bottom], that barge damn sure ain't. . . . If my boat ain't touching nothing, that barge is floating because I'm deeper than the barge.[60]

Helton also testified that the U.S. Coast Guard issues notices that warn vessels of obstructions in the water, that he was

---

[57] R. Doc. 40, Ex. C at 2.

[58] *Id.*, Ex. C at 2.

[59] R. Doc. 62, Ex. 10 at 111-13, 125, 127-28. Helton did testify earlier that his boat had run into some mud, but this does not, for summary-judgment purposes, negate his explicit statement that his boat never ran aground. *Id.*, Ex. 10 at 125, 163.

[60] *Id.*, Ex. 10 at 162-63.

monitoring these notices at the time, and that none of the notices indicated that there were obstructions in the water.[61]

KAI additionally presents the testimony of Thomas Jeanne, who testified that the tugs allowed the ESCAPE to "slam into the concrete dock" during the mooring process.[62] Helton's testimony contradicts this, however. Helton explicitly denied that there was any impact at all between the ESCAPE and the dock.[63]

Based on the foregoing testimony, the Court finds that there is thus an issue of fact as to when the damage to the ESCAPE occurred. KAI contends that the damage to the vessel occurred while it was either returning to the marina or being moored to the dock by Boh Bros. Boh Bros. presents evidence that suggests the damage did not occur while Boh Bros. was still in control of the ESCAPE. If the damage did not occur during the course of the charter, and Boh Bros. returned the vessel without damage, Boh Bros. is not liable for the damage. But the facts surrounding this are disputed.

In addition, the parties do not dispute that J&J Diving Company applied a patch to the ESCAPE after the damage was discovered. Jeanne testified that, after the patch was applied, the barge was "high and dry," and was "[c]ompletely positively

---

[61] *Id.*, Ex. 10 at 164-65.

[62] R. Doc. 93, Ex. F.

[63] R. Doc. 62, Ex. 10 at 127-28.

rust-dried, powdered dry."[64]  He further testified that similar

patches could be expected to hold for "at least a year."[65]

Sometime thereafter, however, the barge sank.  There is thus a

clear issue of fact as to the cause of the barge's loss.  Summary

judgment is inappropriate as to this issue.


*D. Contractual Responsibility for Loss*

Even assuming that the damage occurred while the ESCAPE was

still on charter to Boh Bros., Boh Bros. contends that it is not

responsible under the charter for a loss that occurred when the

vessel was under the owner's control and not the charterer's.

This issue again implicates Section Five of the charter, which

details "liability for loss or damage" and provides the charterer

with certain options in the event of loss or damage.

> In the event of loss of or damage to the vessel,
> charterer, at the option of owner, shall:
>
> a. Place the vessel in good repair; or
> b. Surrender the vessel to owner and pay the lowest of
>    three shipyard repair estimates obtained by owner,
>    whereupon this agreement shall terminate.
> c. If the vessel is lost, pay owner in cash the value
>    of the vessel as set forth in [the contract],
>    whereupon this agreement shall terminate.

---

[64] R. Doc. 93, Ex. E at 186-88.

[65] R. Doc. 62, Ex. 1 at 191.

> Obligations of charterer established in this section
> shall be abated to the extent of insurance payments
> received by owner.[66]

KAI argues that the plain language of subsection (c) establishes that, once Boh Bros. returned the vessel with damage and it was lost, charter hire still accrued until Boh Bros. paid the vessel's full value.

In light of the parties' contentions, the Court must decide whether option (c) may be invoked only when a loss occurs while the vessel is under the control of the charterer and not the owner, as Boh Bros. argues, or if option (c) may be invoked if the *cause* of a loss occurs while the vessel is under the control of a charterer, even if the extent of the damage does not become apparent until after the vessel has been returned to the owner. KAI takes the latter position.

The Court finds that KAI's interpretation is more consistent with the contract, and option (c) applies if the cause of loss occurred while the vessel was in the charterer's possession, even if the loss was not fully manifested until after the vessel's return to the owner. First, the language of the charter contains nothing to indicate that it does *not* cover losses that occur while the vessel is in the owner's control. The charter specifies that if the vessel is damaged, the "charterer, at the option of owner, shall" either repair the vessel or surrender it

---

[66] R. Doc. 40, Ex. A-1 at 2.

to the owner and pay the lowest of three shipyard repair estimates.  Options (a) and (b) apply if the damage is reparable. If the vessel is lost, however, option (c) controls.

Both option (a) and (b) presume that the vessel is still under the charterer's control.  The charterer can hardly place the vessel in good repair himself under option (a) if the boat has been returned to the owner's custody, and option (b) specifically notes that the charterer should *surrender* the vessel to the owner.  Option (c), in contrast, contains no such limitation and makes no mention of possession.  It states only that the charter terminates when the charterer pays the value of the vessel.

Second, if the vessel is a constructive total loss, an owner may not be able to determine whether the vessel is a loss, and thus invoke option (c), until after the charterer returns the vessel and an expert assesses its damage.  A vessel is a constructive total loss when the cost of repairing it is greater than the market value of the vessel immediately before it suffered damage.[67]  Although the term "lost" is not defined in the charter, the Court construes this language to include constructive total losses.[68]  Section Five as a whole focuses

---

[67] *See Ryan Walsh Stevedoring Co. v. James Marine Servs.*, 792 F.2d 489, 491 (5th Cir. 1986).

[68] *See, e.g., Asphalt Int'l Inc. v. Enterprise Shipping Corp.*, 514 F. Supp. 1111, 1114 (S.D.N.Y. 1981), *aff'd*, 667 F.2d

upon restoring the vessel to the condition it was in before any damage, and the inclusion of constructive total losses would be consistent with this focus. Under Section Five, therefore, if damage to the vessel renders it a constructive total loss, the owner might not be able to determine that the vessel was lost until it is returned and surveyed. Only after the survey could the owner determine that the cost of repair exceeded the value of the vessel before the time of damage. Accordingly, in such a situation, option (c) could be invoked only after the vessel had been returned to the owner.

Finally, Boh Bros.'s interpretation could mean that a charterer is not responsible for a loss that it unambiguously caused. For example, if option (c) is foreclosed once the owner takes possession, Section Five would not hold a charterer responsible for the full value of a vessel if it returned the vessel to the owner while it was in the *process* of sinking, but the vessel did not fully sink until after the owner took possession. In the absence of contractual language to the contrary, the Court is doubtful that the charter allows for such a scenario.

The Court thus rejects Boh Bros.'s argument that Section Five is inapplicable if the vessel is lost while in the owner's

261 (2d Cir. 1981); *cf. Fuller v. State Farm Fire & Cas. Co.*, 742 F. Supp. 1128, 1130 (M.D. Ala. 1989); *Hampton Roads Carriers, Inc. v. Boston Ins. Co.*, 150 F. Supp. 338, 341 (D. Md. 1957).

possession.  If the *cause* of the loss occurred while the vessel was still under charter, Boh Bros. would still be responsible for the loss under option (c) even if the vessel was not fully "lost" until it was under KAI's control.

The charter, however, does not allocate the risk of loss for a *failed* repair to Boh Bros.  Under options (a) and (b) of Section Five, Boh Bros. must pay for the repair of any damage that was caused during the charter period.  These two options presume that any damage to the vessel is reparable.  Option (c) applies if the vessel is lost, and the cause of loss occurs during the charter period.  Thus, if the vessel was lost while in the charterer's possession, or if the charterer returns the vessel beyond repair, the charterer is responsible for the full cost of the vessel under option (c).

But if the damage is reparable, nothing in the language of the charter obligates Boh Bros. to shoulder costs beyond the initial repair as described in options (a) and (b).  The charter makes no mention of responsibility for loss as a result of negligent or otherwise faulty repair.  If the ESCAPE was lost as a result of negligent repair, Boh Bros. cannot be held responsible for its full value, even if the initial damage occurred while the ESCAPE was in Boh Bros.'s possession.  In that circumstance, the faulty repair, and not the damage caused during the charter period, would have caused the vessel to be "lost."

Boh Bros.'s liability in this scenario would be limited to the cost of a repair that was done properly.

Therefore, in the present context, Boh Bros. can be held responsible for the full value of the ESCAPE if the vessel was damaged during the charter period, and the vessel was beyond repair. If the damage was reparable, then Boh Bros. is responsible only for the cost of repair. And, of course, if KAI cannot demonstrate that the ESCAPE was damaged while under charter to Boh Bros., Boh Bros. cannot be held responsible for any damage or loss.

*E. Termination of the Charter*

Finally, Boh Bros. argues that, even if the ESCAPE was damaged during the charter period, it is not responsible for the entire sum of charter hire that KAI seeks. Boh Bros. does not concede that the ESCAPE was returned damaged. But it does argue that *if* the vessel were damaged during the charter, the charter terminated at some point before KAI's receipt of insurance payments. Boh Bros. points to two instances when the charter may have terminated: first, when KAI contracted for the ESCAPE to be patched, and second, when the ESCAPE sank. The Court rejects these arguments as inconsistent with the provisions of the particular contract between the parties.

First, Boh Bros.'s contention that the charter terminated when the ESCAPE was patched ignores the plain language of the agreement. It asserts that on July 2, after the ESCAPE had been returned to KAI and KAI employees had noticed the damage, that company hired J&J Diving to apply a soft patch to the hole in the ESCAPE.[69] Jeanne, KAI's president, testified that the ESCAPE was "completely positively rust-dried, powdered dry" after the patch was applied.[70] He further noted that similar patches could be expected to hold for "at least a year."[71] Therefore, Boh Bros. contends, the vessel was placed in good condition and the charter terminated.

This argument, however, elides the contractual requirement that the charter terminates when the *charterer*, not the vessel owner, satisfies its responsibility for placing the vessel in good repair after it was returned damaged, either by placing the vessel in good repair or by paying a repair estimate.[72] Boh Bros. points to no authority to establish that the charter should terminate once the *owner* places the vessel in good repair. In addition, the language of the charter contemplates that the

---

[69] R. Doc. 62, Ex. 1 at 191 (deposition of Thomas Jeanne); Ex. 24.

[70] R. Doc. 75, Ex. B at 186.

[71] *Id.*, Ex. 1 at 191.

[72] R. Doc. 40, Ex. A-1 at 2.

charter does not terminate until the charterer *pays* for the repair. The parties do not dispute that Boh Bros. has not paid for any of the alleged damage to the ESCAPE. Boh Bros. has therefore not demonstrated that the charter terminated under its own terms when KAI arranged to have the patch applied.

Boh Bros.'s second argument for termination is that the charter terminated when the ESCAPE sank. It notes that the charter specifically notes that the ESCAPE "shall be used only for housing workers."[73] Once the vessel sank, Boh Bros. obviously could no longer use it for this purpose, and the charter thus terminated under the doctrines of frustration and impossibility. Boh Bros. points to case law establishing that "[f]rustration of a charter party is a change of conditions so radical that accomplishment of the commercial object of the charter is made impossible."[74] Such a change of conditions relieves the parties of their obligations under the charter.[75] The sinking of the vessel can constitute a change so drastic that the charter is terminated.[76]

---

[73] *Id.*

[74] *Wong Wing Fai Company v. United States*, 840 F.2d 1462, 1471 (9th Cir. 1988) (quoting *United States v. M/V MARILENA*, 433 F.2d 164, 167 (4th Cir. 1969)).

[75] *Id.*

[76] *See, e.g., The TORNADO*, 108 U.S. 342 (1883); *see also Wong Wing*, 840 F.2d at 1471l GRANT GILMORE AND CHARLES L. BLACK, JR., THE LAW OF ADMIRALTY § 4-12 (2d ed. 1979); RESTATEMENT (SECOND) OF

The Court rejects this argument. Under a charter with different provisions, Boh Bros.'s argument might carry weight. But the charter between the parties in this case explicitly contemplates that the charter might continue after the vessel is lost. Again, option (c) states that, if the vessel is lost, the charterer must "pay owner in cash [$250,000], whereupon this agreement shall terminate." The termination of the charter is made conditional upon the payment of the $250,000 and not the loss of the vessel. And the charter does not terminate until the payment is made, even though the vessel has already been lost. Boh Bros. could have insisted upon the inclusion of a provision terminating the charter upon loss of the vessel, as can be found in other charters.[77] But this they did not do. Instead, they entered into an agreement under which the charter would explicitly continue to run after the loss of the ESCAPE if it did not pay the full value of the vessel.[78] In order for a party to be excused from performance on the grounds of impossibility, "the

---

CONTRACTS § 263.

[77] *See, e.g., Asphalt Int'l*, 514 F. Supp. at 1113 (charter included specified that "[s]hould the vessel be lost, hire shall cease at noon on the day of her loss"); *McDonough Marine Servs., Inc. v. M/V ROYAL STREET*, 465 F. Supp. 928, 935 (E.D. La. 1979) (bareboat charter specified that "in the event of a total or constructive total loss, charter hire shall cease effective date of such loss or the date the barge was last heard from"), *aff'd*, 608 F.2d 203 (5th Cir. 1979).

[78] *See Sun Printing & Publishing Ass'n v. Moore*, 183 U.S. 642, 655-56 (1902).

risk of the unexpected occurrence must not have been allocated either by agreement or custom."[79]  And here, the risk in question was allocated by the charter.

In essence, Section Five defines the parties' responsibilities in the event of loss or damage, and by making clear that the charter continues until payment is made, it allocates to Boh Bros. the risk for KAI's inability to use the ESCAPE.  Put differently, by making clear that charter hire accrues until payment is made, Section Five ensures that KAI will not suffer a financial loss if the ESCAPE is lost, and it provides Boh Bros. with an incentive to make prompt payment for any damage it is responsible for.

The Court cannot find that these provisions of the charter are unreasonable.  First of all, the agreement was entered into by sophisticated parties, and the language of the charter is clear.  Boh Bros. cannot argue that it did not realize the effect of Section Five.  It could have insisted that Section Five be

---

[79] *Transatlantic Fin. Corp. v. United States*, 363 F.2d 312, 315 (D.C. Cir. 1966) (Wright, J.); *see also* 2 THOMAS J. SCHOENBAUM AND JESSICA L. MCCLELLAN, ADMIRALTY AND MARITIME LAW § 11-16 (4th ed. 2003 & Supp. 2010); *Asphalt Int'l, Inc. v. Enterprise Shipping Corp.*, 667 F.2d 261, 265 (2d Cir. 1981); *Reefer & Gen'l Shipping Co., Inc. v. Great White Fleet, Ltd.*, No. 93-906, 1995 WL 575290, at *3-4 (S.D.N.Y. Sept. 28, 1995).  In addition, if a bareboat charter is for a fixed period and the agreement between the parties does not account for cessation of the charter in the event of loss or damage, the charterer is responsible for payment of charter hire for the entire term.  *See Shea*, 152 U.S. at 180; *Hollinger v. Warrior Tombigbee Trans. Co.*, 572 F. Supp. 1291, 1296 (N.D. Miss. 1983).

altered or that a clause be inserted into the charter that would terminate the agreement upon loss of the ESCAPE. But Boh Bros. evidently did not do this.

In addition, Section Five does not allow charter hire to accrue indefinitely. Even if Boh Bros. does not pay for damage, its responsibility for continued charter hire ceases once KAI receives insurance payments, either the payments from KAI's insurer or the payments from the hull insurance that Boh Bros. was obligated to purchase under the charter.[80] And, of course, the owner has an obligation to mitigate its damages.[81] Boh Bros. would not be responsible for charter hire that accrued because of the owner's delay or obstinacy. Nor could the owner allow charter hire to accrue out of bad faith.[82]

Boh Bros. has provided no authority to establish that the parties are prohibited from agreeing by express provision that the charter survives the vessel's loss even though the vessel is the charter's object and its continued existence is an assumption upon which the charter was formed. It cites to various cases in

---

[80] R. Doc. 40, Ex. A-1 at 3.

[81] *See Domar Ocean Transp., Ltd. v. Independent Refining Co.*, 783 F.2d 1185, 1191 (5th Cir. 1986).

[82] *See Flores v. Am. Seafoods Co.*, 335 F.3d 904, 913 (9th Cir. 2003) (maritime contracts impose duties upon the parties to act in good faith); *F.W.F., Inc. v. Detroit Diesel Corp.*, 494 F. Supp. 2d 1342, 1359 (S.D. Fla. 2007) ("Every maritime contract imposes an obligation of good faith and fair dealing between the parties in its performance and enforcement.").

which the court determined that a charter terminated upon the loss of the vessel.  But in none of these cases did the charter terminate upon loss despite an express provision to the contrary. In *Texas Co v. Hogarth Shipping Corporation*,[83] for example, the Supreme Court held that a charter was terminated on the grounds of frustration when the British government seized the ship that was the object of the contract and pressed it into war service.

> It has long been settled in the English courts and in those of this country, federal and state, that where parties enter into a contract on the assumption that some particular thing essential to its performance will continue to exist and be available for the purpose and neither agrees to be responsible for its continued existence and availability the contract must be regarded as subject to an implied condition that, if before the time of performance and without the default of either party the particular thing ceases to exist or be available for the purpose, the contract shall be dissolved and the parties excused from performing it.[84]

The Court, however, also specifically noted that the rule "does not apply where the risk is fully covered by a term of the contract."[85]  Here, the risk of loss was both anticipated by the parties and provided for in the contract.  Therefore, under the terms of this specific charter, Boh Bros. cannot assert that the

---

[83] 265 U.S. 619 (1921).

[84] *Id.* at 629-30.

[85] *Id.* at 630; *see also Transatlantic Fin. Corp.*, 363 F.2d at 315 (doctrine of frustration applies only when the risk is not provided for by agreement or custom); 2 THOMAS J. SCHOENBAUM AND JESSICA L. MCCLELLAN, ADMIRALTY AND MARITIME LAW § 14-6 (4th ed. 2003 & Supp. 2010) (same).

loss terminated the contract because as a result of frustration and impossibility.

Finally, Boh Bros. suggests that the charter must have terminated upon the sinking of the ESCAPE because, under admiralty law, damages for loss of use are foreclosed when, as here, the vessel is rendered a total loss and is not merely damaged in part.[86]  Boh Bros., however, has pointed to no authority to indicate that this rule would invalidate the plain language of the charter.  In addition, the Supreme Court has explained that the rule prohibits recovery of profits from charters "not yet entered upon."[87]  Boh Bros. has shown no reason why this rule should override the plain import of the charter.

In sum, there is an issue of fact as to when the charter terminated.  If the damage did not occur while the ESCAPE was on charter to Boh Bros., then Boh Bros. is not responsible for any damage or loss.  If the damage occurred while the ESCAPE was on charter, the doctrine of frustration and impossibility does not

---

[86] *See Albany Insurance Company v. Bengal Marine, Inc.*, 57 F.2d 250, 253 (5th Cir. 1988); *see also King Fisher Marine Serv., Inc. v. NP Sunbonnet*, 724 F.2d 1181, 1185 (5th Cir. 1984); *A&S Trans. Co. v. Tug Fajardo*, 688 F.2d 1, 2 (1st Cir. 1982); *Stoufflet*, 236 F. Supp. at 201; 2 THOMAS J. SCHOENBAUM AND JESSICA L. MCCLELLAN, ADMIRALTY AND MARITIME LAW § 14-6 (4th ed. 2003 & Supp. 2010).

[87] *The UMBRIA*, 166 U.S. 404, 422-23 (1897) ("in cases of a total loss the recovery of [future] profits is limited to the voyage which the vessel is then performing"); *see also In re P & E Boat Rentals, Inc.*, 872 F.2d 642, 648-49 (5th Cir. 1989).

apply to the loss of the ESCAPE because the charter specifically allocates the risk of the vessel's loss. In neither case would the charter have terminated upon the sinking of the ESCAPE. Neither party is entitled to summary judgment on this point.

## IV. Conclusion

For the foregoing reasons, the motions for summary judgment are DENIED to the extent discussed in this Order. Because neither party is a "successful party," the Court need not address the issue of attorneys' fees.[88]

New Orleans, Louisiana, this ___9th___ day of August, 2010.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

_____

[88] *See* R. Doc. 40, Ex. A-1 at 4-5.